**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

DAVID HUME, IV
MAGISTRATE IN CHANCERY

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DE 19947

July 31, 2026

Thad J. Bracegirdle
Emily Skaug
BAYARD, P.A.
600 N. King Street, Suite 400
Wilmington, DE 19801
*Attorneys for Plaintiff*

Evan O. Williford
THE WILLIFORD FIRM LLC
1007 N. Orange Street, Suite 235
Wilmington, DE 19801
*Attorney for Defendant*

RE:     *SPG Greensboro Equities, LLC v. Ivy Greensboro I, LLC*,
          C.A. No. 2025-0472-DH

Dear Counsel:

This is the parties' latest legal exchange over a Greensboro, North Carolina student housing project. A sole manager of the housing project found a willing investor to become co-manager. That was likely their last time in agreement as the prior sole manager refused to relinquish control, mismanaged the housing project, and eventually led to the investor's representative being appointed receiver. The prior sole manager did not contest a default judgment for breaches of contract and fiduciary duty. But the prior sole manager did not go away quietly. It contested the alleged damages resulting from the mismanagement and breaches. This is my decision after a hearing on the parties' contentious damages dispute.

## I.    BACKGROUND[1]

The parties are well-aware of the facts.    SPG Greensboro Equities, LLC ("SPG") and Ivy Greensboro I, LLC ("Ivy") were the members of 3610 Clifton Road Associates, LLC (the "Company").[2]    The Company owns and manages a student college housing project located at 3610 Clifton Road, Greensboro, North Carolina (the "Property").[3]    Ivy was originally the sole member before SPG agreed to invest. This union was created through an Operating Agreement.[4]    The Operating Agreement made SPG and Ivy co-managers of the Company with equal control.[5] Shortly after entering into the Operating Agreement, the parties also signed a Letter Agreement that contemplated SPG investing a total of $6 million in the Company.[6] SPG invested $2,759,000 in the Company.[7]    The Letter Agreement accounted for a

---

[1] I draw the following facts from Docket Item ("D.I.") 1, Plaintiff's Verified Complaint ("Compl.") and Exhibits attached thereto, D.I. 43, the Damages Hearing Transcript ("Tr."), D.I. 10, the Order of Default Judgment, and D.I. 36 the Pre-Hearing Stipulation and Order ("PHO") and forty-six joint exhibits, as well as uncontested facts in the parties' post-hearing briefing.    I refer to the parties' briefing as follows:  D.I. 41, Plaintiff's Post-Hearing Opening Brief ("PPOB"), D.I. 46, Defendant's Post-Hearing Answering Brief ("DPAB") and D.I. 48, Plaintiff's Post-Hearing Reply Brief ("PPRB").

[2] PHO II, 2.

[3] *Id.*

[4] JX 4.

[5] *Id.* at § 5.01.

[6] JX 6.

[7] *Id.* at ¶ 2; Compl. ¶ 6.

reduced share of the Company for the less than initially conceived $6 million investment. As a result, SPG holds a 23% interest in the Company instead of a planned 50% interest.[8] The Letter Agreement also provided that the Company would return 7% of SPG's investment for three years from the date of the agreement (the "preferred return").[9]

After SPG's investment, things started to fall apart. SPG requested financial information, but it was not provided.[10] SPG also received only one month's payment of the 7% preferred return.[11]

SPG filed an action (the "First Action") against Ivy in this Court on November 21, 2022.[12] On April 17, 2023, the Court granted a Consent Order Staying Contempt Proceedings.[13] That Order required Ivy to make three "catch up" payments of $16,094.17 for the preferred return plus ongoing monthly distributions in the same

---

[8] PHO II, 8–9; JX 6.

[9] JX 6.

[10] Tr. 20:11–17.

[11] *Id.* at 20:18–22.

[12] SPG Greensboro Equities LLC v. Ivy Greensboro I, LLC, C.A. No. 2022-1058-JTL.

[13] JX 15.

amount.[14]    The parties documented the preferred return payments.[15]    As of December 2025, The Company has paid SPG not less than $553,138.44.[16]

The Court appointed Eli Zakay ("Zakay") as Receiver on March 25, 2024.[17] Zakay replaced all roofs, ensured all units were habitable, and changed 24 HVAC units, increasing occupancy to 93%.[18]  As Receiver, Zakay learned that some units were damaged and that the Company had received an insurance settlement.[19]  Even so, although the damage had been repaired, some vendors had not been paid.[20] Ultimately, SPG obtained a list of the claims and amount paid for each.[21]  As of April 2024, Ivy's AP Aging report showed over $952,000 in open balances owed for work performed.[22]

---

[14] *Id.*

[15] JX 43.

[16] *Id.*

[17] PHO II, 11.

[18] Tr. 45:22–46:03

[19] *Id.* at 28:16–21; JX 11.

[20] Tr. 28:17–21.

[21] JX 39.

[22] JX 25.

When Zakay became Receiver, BluSky Restoration Contracts, LLC ("BluSky") was owed over $300,000 for work performed.[23] On September 19, 2024, BluSky filed an action against the Company and other entities in North Carolina.[24] On December 31, 2024, BankPlus closed a loan to the Company for $1,300,000. Zakay knew BluSky was seeking payment but decided not to pay BluSky at that time.[25] Later, BankPlus loaned the Company an additional $400,000.[26] BluSky's bill remains unpaid.[27]

On May 27, 2025, the North Carolina Secretary of State revoked the Company's Certificate of Authority for failing to file an annual report.[28] On July 16, the Company filed for restoration of the Certificate of Authority.[29] On June 30, BluSky obtained a default judgment against the Company for $302,130.95.[30]

---

[23] Tr. 33:9–11; JX 35.

[24] PHO II, 13.

[25] *Id.* at 14.

[26] *Id.* at 15.

[27] JX 27, 31.

[28] JX 29.

[29] JX 32.

[30] PHO II, 18.

### A. Procedural History

SPG filed a Verified Complaint against Ivy for breach of the Operating Agreement, the Letter Agreement, and fiduciary duties that Ivy owed to SPG.[31] SPG sought damages no less than SPG's investment in the Company, plus the preferred distributions still owing, plus pre-and post-judgment interest.[32] SPG also sought a charging order against Ivy's membership interest in the Company, and its costs and expenses.[33] The Complaint discusses the Property's disrepair and the cost of repairs.[34] The Complaint also summarily reviews the lack of insurance proceeds paid to vendors hired to repair claims.[35] In several places, the Complaint discusses the relief sought. For instance, SPG requested, "[a]t a minimum . . .entitle[ment] to damages from (Ivy) of no less than SPG's investment in the Company and the accrued and unpaid distributions still owed to SPG, plus pre- and post-judgment interest."[36] As to the Breach of Contract and Breach of Fiduciary Duty counts, SPG posited the same damage allegation, "Plaintiff has suffered damages in an amount

---

[31] Compl.

[32] *Id.* at ¶ 12.

[33] *Id.* at ¶ 13.

[34] *Id.* at ¶ 26.

[35] *Id.* at ¶ 27.

[36] *Id.* at ¶ 31.

to be determined at trial, but no less than the amount Plaintiff invested in the Company plus the total sum of preferred distributions which the Company failed to pay when due and remain owed to Plaintiff."[37]   Finally, the Complaint requested a Final Order, "Awarding Plaintiff damages from Defendant in an amount to be determined at trial, but no less than the total sum of Plaintiff's investment in the Company and preferred distributions from the Company which remain due and owing to Plaintiff."[38]  Ivy did not respond to the Complaint and SPG filed a Motion for Default Judgment on June 13, 2025.[39]  On July 15, the Court granted the Motion for Default Judgment.[40]  On September 9, Ivy's counsel entered his appearance and on September 14, Ivy filed an Objection to the Final Judgment and Charging Order.[41] The next day, Ivy filed a Motion to Reconsider the Default Judgment.[42]   On September 30, the Court denied both of Ivy's motions but determined that a hearing on the damages should be held.[43]  On October 8, the matter was reassigned to me.[44]

---

[37] *Id.* at ¶¶ 39, 43.

[38] *Id.* at A.

[39] D.I. 4.

[40] D.I. 10.

[41] D.I. 14, 15.

[42] D.I. 16.

[43] D.I. 20, 21.

[44] D.I. 22.

A Damages Hearing was held on February 9, 2026.[45] Zakay and Ivy's owner and manager, Shangxuan Tan ("Tan"), testified at the hearing.[46] The parties submitted post-hearing briefing.[47]

## II. ANALYSIS

SPG seeks pro rata damages in four areas: Lost Investment in the Company, Lost Property Value, Insurance Proceeds, and Preferred Returns.

### A. SPG Has Not Demonstrated Lost Investment in the Company.

SPG argues that it invested $2,607,373.09 for its membership interest in the Company.[48] During the pre-investment negotiation, Zakay had an "understanding" that his investment would be used "to own part of the company and to better the property in order to make money."[49] SPG contends that Ivy failed to make capital improvements and the Company obtained loans to make repairs.[50] For this, SPG asks for the return of its entire $2,607,373.09 investment. SPG does not explain how the entire investment has been eliminated. Nor does SPG indicate what will happen

---

[45] D.I. 43.

[46] Tr. 74:03–08.

[47] D.I. 41, 46, 48.

[48] PPOB at 13.

[49] Tr. 11:14–20.

[50] PPOB at 13–14.

to its interest in the Company if its complete investment plus distributions are provided. There is no request for rescission. For its part Ivy contends that SPG did not plead a breach of the Letter Agreement, and it could not show a promise outside the Letter Agreement justifying return of the investment.[51]

In my view, Ivy takes too myopic a stance on the relationship between the Operating Agreement and Letter Agreement. They are unequivocally related. The Letter Agreement begins with the heading "Letter Agreement" but below reads "Re: Amended and Restated Limited Liability Company Agreement ("Operating Agreement") of 3610 Clifton Road Associates, LLC (the "Company")." The Letter Agreement references the Operating Agreement internally, including applying the Operating Agreement's term definitions to the Letter Agreement and reiterating the "full force and effect" of the Operating Agreement.[52] "Delaware law allows for agreements related to the same business transaction and subject matter, and entered into in close temporal proximity of one another, to be read together as one overall agreement." *Ashland LLC v. Samuel J. Heyman 1981 Continuing Tr. for Heyman*, 2017 WL 1224506, at *6 (Del. Super. Mar. 30, 2017) (citing *E.I. du Pont de Nemours & Co. v. Shell Oil Co,* 498 A.2d 1108, 1115 (Del. 1985) (stating that the

---

[51] DPAB at 19–23.

[52] JX 6.

agreements and the "interrelationship thereof ma[d]e it clear that the parties intended [them] to operate as two halves of the same business transaction.")). The Operating Agreement and Letter Agreement are related. Ivy's attempt to parse the breach of one interrelated document versus another is unavailing.

But SPG does not succeed. On its best day, SPG can argue that Zakay was told that SPG's contributions would be used "to better the property in order to make money."[53] That says very little. Vague pre-execution assertions comprise too thin a reed to bear such a weighty damage request. SPG also misapprehends section 4.01 of the Operating Agreement that it cites in its Reply Brief.[54] There, "Each Member acknowledges and agrees that such all or part of the Capital Contributions are intended to be invested in the Company for the Company's purchase of that certain Student Housing Project in Greensboro, North Carolina known as "Spring Place," and otherwise in accordance with this limited liability company agreement."[55] Operating Agreement Section 4.01 specifically contemplates that only a portion of the Capital Contributions would be invested in the Company. It does not say how the contributions will be invested (*e.g.*, repairs, upgrades, new construction, staffing,

---

[53] Tr. 11:18–24.

[54] PPRB at 8.

[55] JX 4, § 4.01(a).

etc.). Thus, despite Zakay's pre-execution "understanding", the Operating Agreement disabused the notion that the complete capital contribution would be sunk into the physical property. *See generally Freeman v. Qualizza*, 2022 WL 3330377, at *7 (Del. Ch. Aug. 12, 2022) ("All conversations and parol agreements between the parties prior to the written agreement are so merged therein that they cannot be given in evidence for the purpose of changing the contract or showing an intention or understanding different from that expressed in the written agreement.").[56]

SPG's request suffers from other problems. First, there is no evidence of how diminished its capital investment is. It mentions its total investment of over $2 million, Zakay's understanding, and the spreadsheets showing $738,000 in proposed capital expenditures over four years. Yet SPG seeks the return of all of its investment. SPG has offered no concrete means to evaluate a loss, if any. But there is a second problem. SPG does not explain what would happen to its interest in the Company if it received its investment back. It has not sought rescission. The Company, through the Property, retains significant value. SPG would receive a windfall if it received its investment proceeds while retaining an interest in the

---

[56] The operating agreement includes both a merger clause and an anti-reliance clause. *See* JX 4, §§ 18.05 ("No Reliance"), 18.09 ("Entire Agreement").

property.  SPG has neither proven a loss in the value of its investment nor why it is entitled to its return while maintaining the interest in the company.

## B. SPG is Not Entitled to Damages for Lost Property Value

SPG presented two appraisals to show lost property value.  The first appraisal took place on December 17, 2021 and valued the Property at $34.5 million.[57]  The second appraisal took place on April 29, 2024 and valued the Property at $24.8 million.[58]  SPG seeks to recover the difference between valuations.[59]  SPG urges me to follow the Superior Court's holding in *State v. Ellery*, compare the two appraisals, and find that the difference, $9.7 million, is the lost property value.  1992 WL 179411, at *3 (Del. Super. Ct. July 16, 1992).  SPG seeks its pro rata share of this difference, $2,231,000.[60]  Conversely, Ivy argues that the appraisals are not a valid measure because they are the bare reports of persons who were not qualified as experts and not subject to cross-examination for their opinions.[61]  Ivy contends that the appraisals lack a sufficient nexus to SPG's damages request because the appraisals do not show a connection between the differing values and Ivy's

---

[57] JX 3.

[58] JX 26.

[59] PPOB at 13.

[60] PPOB at 17.

[61] DPAB at 33–39.

conduct.[62] Ivy urges me to not consider the appraisals because they come from non-testifying experts. *Zohar II 2005-1, Ltd. v. FSAR Hldgs., Inc.*, 2017 WL 1732334, at \*1 (Del. Ch. May 3, 2017) ("Expert opinions should be subject to cross-examination except in limited circumstances . . . .").

But before I can consider the parties' arguments on the appraisals, I must consider Ivy's preliminary argument that the relief sought in the Damages Hearing exceeds the relief requested in the Complaint under Court of Chancery Rule 54(c) and *Winklevoss Capital Fund, LLC v. Shaw.* 2024 WL 3888757 (Del. Ch. Aug. 21, 2024). Rule 54(c) states, "A judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleading. But a judgment by default must not grant relief different in kind from or greater in amount than the relief sought in the pleading." *Winklevoss* applied this Rule in the default judgment context. The Court identified the important policy underpinnings of Rule 54(c). First, default judgments may be the result of a defendant's tactical decision. *Winklevoss*, 2024 WL 3888757, at \*12. As the Court explained, "If a defendant calculates that his maximum liability for a default judgment is less than what he would owe by litigating through a post-trial judgment, taking into account his own

---

[62] *Id.* at 36.

attorneys' fees to get to such a judgment, it may be economically rational for a defendant simply to default (assuming settlement is not a viable option)." *Id.* at *12. If a defendant so elects, this practice also preserves the Court's limited resources while granting the plaintiff the relief requested in the pleadings, and providing a defendant with a known liability exposure. *Id.* With this backdrop, a plaintiff's damage request must give the defendant a degree of notice about the defendant's exposure. *Id.* While this does not require a plaintiff to plead damages with unerring specificity, some notice to a defendant is required. *Id.* Very general requests, like "such other and further relief as the Court deems just and appropriate" are insufficient. *Id.*

In *Winklevoss*, the Court confronted a damages request in the complaint for "compensatory damages" plus relief "as the Court deemed just and appropriate." *Id.* at *11. The plaintiff later sought rescissory damages post-default. *Id.* The Court declined to grant rescissory damages because the rescissory damages were "different in kind" from the complaint's requested compensatory damages. *Id.* at *12.

Despite the different factual scenario presented here, *Winklevoss*'s legal conclusions prove beneficial and probative. The Complaint includes claims for Breach of Contract and Breach of Fiduciary Duty. Each of those claims contains identical, general requests for damages, "in an amount to be determined at trial, but

no less than the amount Plaintiff invested in the Company plus the total sum of preferred distributions which the Company failed to pay when due and remain owed to Plaintiff."[63]  The Complaint's summative request for damages is just as general, "Awarding Plaintiff damages from Defendant in an amount to be determined at trial, but no less than the total sum of Plaintiff's investment in the Company and preferred distributions from the Company which remain due and owing to Plaintiff, plus pre- and post-judgment interest at the legal rate, compounded quarterly."[64]  I do not look to *Winklevoss*'s "different in kind" analysis because SPG did not request compensatory versus rescissory damages.  Indeed, SPG does not specify the source of the damages.  It is clear to me from the Complaint and default judgment that Ivy bears some burden for damages.  I look deeper at the Complaint in an effort to see if SPG can support its request.  The Breach of Contract claim contends that Ivy unilaterally managed the Company in violation of the Operating Agreement and failed to make the 7% distributions consistent with the Letter Agreement.[65]  SPG pled that Ivy mismanaged the Company "including but not limited to squandering and misappropriating Plaintiff's capital investment in the Company and other assets"

---

[63] Compl.  ¶¶ 39, 43.

[64] *Id.* at A.

[65] *Id.* at ¶¶ 34–38.

and refused to pay SPG the distributions.[66]  On the clearest of days, I cannot see where SPG put Ivy on notice of lost property value.  There is no mention of the difference in appraised value or the appraisals themselves.  The difference between the two appraisals is $9.7 million—not an insignificant sum.  SPG's alleged pro rata share is $2,231,000.  This amount nearly equals SPG's total capital investment in the Company.  I do not find that SPG put Ivy on notice of this sum as potential damages.  Moreover, SPG's damages request does not suggest a limitation for damages.  The pleading "no less than the amount Plaintiff invested in the Company plus the total sum of preferred distributions which the Company failed to pay when due and remain owed to Plaintiff" is a damages floor, not a ceiling.  It does not create a limitation that would lead Ivy to believe it would be  responsible for lost property value, especially in the amount requested.  It would be inequitable to grant damages that are not even inferred in the Complaint and that nearly equal SPG's total capital investment.  Try as I might, the Complaint does not guide me to the damages SPG requests.  SPG's request for Lost Property Value damages is denied.

---

[66] *Id.* at ¶¶ 37–38.

### C. SPG is Entitled to a Pro Rata Share of the Insurance Proceeds for the BluSky Work.

SPG alleged in the Complaint that Ivy filed insurance claims with the Company's carrier, received funds for those claims, but those claims remain unpaid.[67] One of the entities who performed work on the Property was BluSky, which was not paid. SPG seeks the pro rata share of the proceeds that were intended to pay BluSky. The total amount owed to BluSky is $321,849, so SPG seeks a 23% pro rata share equaling $74,025.35.

Ivy contends that it owes no repayment of insurance proceeds because it seeks a different (although lesser) amount than found in Zakay's affidavit, it did not request the damages in the Complaint (as it argued with regard to the lost property value), and it did not "connect the dots" between the harm suffered and the Complaint. *Winklevoss*, 2024 WL 3888757, at *9. Ivy takes issue with SPG's wording in the Complaint that "it appears that (Ivy) either wasted the insurance proceeds or pocketed them for its own use."[68] Finally, Ivy notes that the default

---

[67] *Id.* at ¶ 27.

[68] *Id.*

judgment BluSky obtained against the Company was $302,130.95 and 23% of that amount is $69,490.12.[69]

I am cognizant of the concern present in default judgments:where a defendant contests damages, that defendant may also seek to collaterally attack the default judgment.  This is not allowed.  Ivy elected not to contest the Complaint and the Court entered a default judgment.  Under Court of Chancery Rule 55(a)(2), "a party in default admits and cannot present evidence to contest the allegations of the complaint."  "The effect of a default in answering, however, is to deem admitted all the well-pleaded facts in the complaint." *Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586 (Del. 2008).  SPG pled that Ivy filed insurance claims for the Property's damage with the insurance carrier but those funds were not used to pay BluSky.[70]  It pled that Ivy appeared to either waste the insurance proceeds or pocket them for its own use.[71]

These well-pleaded facts indicate to me Ivy filed insurance claims for the Company and the insurance carrier paid them, but that when Zakay took over, the

---

[69] DPAB at 25.

[70] Complaint ¶ 27 does not mention BluSky but does reference that the vendor is owed more than $320,000.  It is apparent that this references BluSky.

[71] *Id.*

funds were no longer present and the bills remain unpaid.  The reasonable interpretation is that Ivy used those funds for something other than paying the repair bills.  Ivy's attempts to now parse the colloquial terms in the Complaint come too late. Ivy elected to allow the default judgment to occur.  It received a benefit because SPG was held to its damage request in the Complaint.  But SPG also gets the benefit of its pleading.  SPG's Complaint is sufficient to connect the dots between the harm (unpaid billing for property repair) and the Complaint (Ivy, as manager, sought and received insurance proceeds for damage to the property).

Ivy has also argued "that insurance only pays for work that has already been done and paid for."[72]  In support of this, Ivy points to Tan's testimony that BluSky is owed nothing because payments are made to BluSky by the insured first followed by  the insurance company compensating the insured.[73]  That is illogical in this situation.  Had BluSky been paid, it would not and could not have obtained a default judgment against the Company.  The Company is a Delaware LLC and Ivy, as manager, owed duties of loyalty and care.  *Triple H Fam. Ltd. P'ship v. Neal*, 2018 WL 3650242, at *18 (Del. Ch. July 31, 2018) (citations omitted).  "The duty of care requires that managers avoid 'conduct that constitutes reckless indifference or

---

[72] DPAB at 28.

[73] Tr. 91:03–13.

actions that are without the bounds of reason.'" *Id.* (quoting *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008)). Ivy breached its fiduciary duty when it neglected to meet the Company's financial obligations to vendors from insurance proceeds. Ivy owes damages to SPG for the failure to satisfy payments from the insurance proceeds.

SPG provided documents in support of the amounts owed to BluSky.[74] While these amounts and the amount in Zakay's affidavit may vary, BluSky obtained a default judgment for $302,130.95. This is the most concrete evidence of what is owed. SPG is entitled to an award of 23% of that amount, $69,490.12.

### D. SPG is Entitled to the Distributions Set Forth in the Letter Agreement.

The Letter Agreement required that for three years from its execution date, the Company was to return 7% of SPG's investment.[75] The Letter Agreement defines SPG's investment in the Company as $2,759,000.[76] Yet both the Pre-Hearing Order and SPG's Opening Brief list SPG's investment as $2,607,373.09.[77] In the companion case to this one, the parties agreed to a Consent Order that required three

---

[74] JX 11, 13, 39.

[75] JX 6, ¶ 5.

[76] *Id.* at ¶ 2.

[77] PHO § 2, ¶ 3; PPOB at 7.

monthly "make-up" payments of $16,094.17 followed by a monthly payment of $16,094.17 each month.[78]  Evidence presented in the hearing shows that this amount was paid monthly, when payments were made, up to a total of $553,138.44.[79]  Multiplying the $16,094.17 payment by the thirty-six months in the Letter Agreement provides a total of $579,390.12.[80]  As readers might expect by now, SPG urges me to consider the higher investment amount found in the Letter Agreement and the Complaint while Ivy implores me to take the amount from the Pre-Hearing Order and SPG's Opening Brief.  I cannot ignore that the $2,759,000 figure SPG supports was found in the foundational documents in this case, the Letter Agreement and the Complaint.  The Complaint provided Ivy with notice of the amount in controversy.  I accept $2,759,000 as the accurate figure.  This analysis was certainly made more difficult by the parties' unexplained insertion of $2,607,373.09 via the Pre-Hearing Order and SPG's Opening Brief.  But I cannot countenance reliance on the lower figure not mentioned in the Letter Agreement or Complaint.  This is a

---

[78] SPG Greensboro Equities LLC v. Ivy Greensboro I, LLC and 3610 Clifton Road Associates, LLC, C.A. No. 2022-1058-JTL (Del. Ch. Apr. 17, 2023).

[79] JX 43.

[80] Resulting in a difference of $26,251.68 between the Letter Agreement total and payments made as of the Damages Hearing.

Court of Equity. Our bedrock is the fair, rational, and just. Hypertechnical arguments that defy these tenets ring hollow.

Turning to Ivy's next argument, it suggests that it does not owe distributions because Zakay was Receiver for the final 15 months of the term.[81] Again, Ivy resorts to a nuanced view. It argues (without acknowledging its own failure to pay that resulted in the Receiver's appointment and Consent Order) that the three-year investment return period was to end in July 2025.[82] Zakay was appointed receiver in April 2024, so the Company was exclusively controlled by Zakay for the last 15 months of the term.[83] Courts are permitted to use "conscience and reason" in estimating and assessing imprecise damages. *S'holder Rep. Servs. LLC v. Alexion Pharm., Inc,* 341 A.3d 513, 542–43 (Del. Ch. 2025) (citations omitted). Delaware Courts follow the "wrongdoer rule" when determining damages:

> Doubts [about the extent of damages] are generally resolved against the party in breach. A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred. *A court may take into account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty, giving greater discretion to the trier of the facts*. Damages

---

[81] DPAB at 17.

[82] *Id.*

[83] *Id.*

> need not be calculable with mathematical accuracy and are often at best approximate.

*Id.* (citations omitted) (emphasis in original). Ivy elected default judgment. In doing so, I accept all well-pleaded facts as true. The facts, as previously set forth in this letter and in the Complaint, support that Ivy breached the contracts and its fiduciary duties. Ivy quibbles with the timing as Zakay became Receiver fifteen months before the distributions' end date. Ivy chooses to ignore that the contractually obligated distribution payments were not made on its watch as the entity controlling the Company. It walled off SPG from control. Ivy's argument that SPG is responsible when Ivy created the problem is hypocrisy. Ivy decided not to make payments. Zakay became Receiver. Ivy decided not to contest the Complaint. Any question about responsibility here is resolved against the party in breach, Ivy. Ivy owes $26,251.68 for unpaid distributions to SPG.

### E. SPG is Entitled to Pre-Judgment Interest.

SPG seeks pre-judgment interest. Ivy argues that if any interest should be awarded, it should be simple interest on SPG's breach of contract claim.[84] "In Delaware, prejudgment interest is awarded as a matter of right" and "computed from the date payment is due." *In re Bremerton Cellular Tel. Co. Litig.*, 328 A.3d 330,

---

[84] *Id.* at 44.

353 (Del. Ch. 2024) (citations omitted). "In the absence of an express contract rate, Delaware courts use the 'legal rate' as a default rate." *Id.* (citations omitted). Ivy argues that I should depart from the legal rate because of the "debatable and contentious circumstances" surrounding the relationship.[85] But these "circumstances" were created by Ivy. I see no reason to depart from the legal rate. Ivy owes pre-judgment interest at the legal rate.

### F. SPG is Not Entitled to Fee-Shifting

SPG contends that the Court should award SPG its attorneys' fees based on the bad faith exception to the American Rule.[86] "Under the American Rule, absent express statutory language to the contrary, each party is normally obliged to pay only his or her own attorneys' fees." *Gatz Props., LLC v. Auriga Cap. Corp.*, 59 A.3d 1206, 1222 (Del. 2012) (quoting *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 545 (Del. 1998)). When applying the American Rule, this Court "do[es] not award attorneys' fees to a prevailing party absent some special circumstance." *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225, 231 (Del. Ch. 1997). When the alleged circumstance is bad faith, the plaintiff is required to show by clear and convincing evidence that the defendant acted in

---

[85] *Id.*

[86] PPOB at 20.

bad faith. *Shawe v. Elting*, 157 A.3d 142, 150 (Del. 2017) (citing *Lawson v. State*, 91 A.3d 544, 552 (Del. 2014)).

Bad faith "must derive from either the commencement of an action in bad faith or bad faith conduct taken during litigation, and not gave rise to the underlying cause of action." *Versata Enterprises, Inc. v. Selectica, Inc.*, 5 A.3d 586, 607 (Del. 2010) (citing *Johnston* at 546; *see Keen-Wik Ass'n v. Campisi*, 2020 WL 6162957 at *6 (Del. Ch. Oct. 19, 2020) ("[F]ailure to respond to the action prior to the entry of default judgment, alone, is not evidence of bad faith."), *adopted* 2020 WL 6507267 (Del. Ch. Nov. 4, 2020). But turning a blind eye to litigation or intentionally allowing a default judgment to occur does not equal bad faith. "[E]ntry of default judgment, alone, is not evidence of bad faith. Otherwise, every defaulted party would be acting in bad faith, which contravenes the higher standard set for bad faith conduct." *Id.* "Thus, even with a default judgment, fees will not be shifted absent clear evidence of subjective bad faith." *Sachs v. Sachs*, 2023 WL 2379389, at *18 (Del. Ch. Mar. 7, 2023) (quoting *Keen-Wik Ass'n*, 2020 WL 6162957, at *6 (cleaned up)). As Vice Chancellor Cook definitively explained in *Winklevoss*, parties may opt for the certainty and efficiency of default judgment. *Winklevoss Cap. Fund, LLC v. Shaw,* 2024 WL 3888757, at *12 (Del. Ch. Aug. 21, 2024). He stated most pithily, "default judgments are not inherently bad." *Id.*

SPG attempts to bootstrap Ivy's punished conduct in the First Action to this one. SPG argues that Ivy incurred a fee-shifting sanction in the First Action.[87] True enough. But there, Ivy was found in contempt of the Default Judgment Order and failure to comply with the Show Cause Order or Lift Stay Order.[88] SPG asks me to consider this punished conduct again to sanction otherwise legitimate conduct here. I will not. Here, as in the First Action, Ivy defaulted. But Ivy has not failed to comply with the Default Judgment Order nor any other order in this case so far. Ivy made a choice. That choice has consequences, like Ivy's liability for the insurance proceeds and Letter Agreement distributions. But the default judgment here has not involved bad faith. The request to shift fees is denied.

---

[87] *Id.* at 20–21.

[88] 2022-1058-DH.

## III.   CONCLUSION

For the reasons explained above, I recommend that Ivy be assessed damages for the insurance proceeds and unpaid distributions, along with pre-judgment interest.  I do not recommend fee-shifting.  This is a report pursuant to Court of Chancery Rule 144.

Sincerely,

*/s/ David Hume, IV*

David Hume, IV
Magistrate in Chancery

cc:    All counsel of record (by File & ServeXpress)